**Affirmed, In Part, Reversed and Rendered, In Part, and Majority and Concurring Opinions filed December 28, 2012.**



In The

# 𝕱𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝕮𝔬𝔲𝔯𝔱 𝔬𝔣 𝕬𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-11-00125-CV

**TEXAS STANDARD OIL & GAS, L.P., GRIMES ENERGY CO., AND PETROVAL, INC, Appellants**

**V.**

**FRANKEL OFFSHORE ENERGY, INC., Appellee**

On Appeal from the 127th District Court
Harris County, Texas
Trial Court Cause No. 2008-55176

## MAJORITY OPINION

Appellants, Texas Standard Oil & Gas, L.P. ("Texas Standard"), Grimes Energy Co. ("Grimes"), and PetroVal, Inc. ("PetroVal") [collectively "GTP"],[1] appeal a judgment in favor of Frankel Offshore Energy, Inc. ("Frankel") in this suit arising out of the parties' failed venture for development of oil and gas prospects.

Frankel sued GTP seeking damages for various claims, including breach of fiduciary duties, and rescission of a settlement agreement previously executed by the parties in which Frankel released all of its claims. GTP counterclaimed for Frankel's alleged breach of the settlement agreement. After a jury returned a verdict which would have resulted in no award of damages to Frankel on any claims, including breach of fiduciary duties, the trial court ordered that Frankel recover $4,010,175.06 for equitable disgorgement based on GTP's alleged breach of fiduciary duties. The trial court also (1) ordered rescission of the settlement agreement based on the jury's finding that GTP fraudulently induced Frankel to execute the agreement and (2) concluded that a release of fraudulent-inducement claims in the settlement agreement was unenforceable because the parties were fiduciaries.

In three appellate issues, GTP contends (1) the trial court erred by rescinding the settlement agreement, (2) the trial court erred by concluding the parties were fiduciaries, and (3) the equitable-disgorgement award violated various procedural and substantive principles. GTP not only seeks to reverse the order of rescission and the equitable-disgorgement award, but also requests an award of damages in its favor based on an additional jury finding that Frankel breached the settlement agreement.

---

[1] "GTP" is not a legal entity but is used by the parties as a reference to appellants collectively. For consistency, we will use this reference except when necessary to refer to an appellant separately.

Because we hold the release precluded all of Frankel's fraudulent-inducement claims that were supported by the evidence, we reverse that portion of the trial court's judgment ordering rescission of the settlement agreement and render judgment denying Frankel's request for rescission. Therefore, we also reverse the portion of the judgment ordering equitable disgorgement and render judgment that Frankel take nothing on its request for equitable disgorgement. We affirm the remainder of the judgment, including the order that GTP take nothing on its claim for breach of the settlement agreement, albeit for a different reason than described by the trial court—GTP has failed to show it is entitled to recovery on this claim even under a valid settlement agreement.

## I. BACKGROUND

### A. Factual Background

In July 2006, Frankel and GTP formed FGP, LLC ("FGP"), a Delaware limited liability company, for purposes of holding seismic data licenses to be used for developing oil and gas prospects. FGP filed a Certificate of Formation in the State of Delaware. Frankel was the managing member of FGP, with a 50% share, and Grimes, PetroVal, and Texas Standard were members with various percentage shares of the remaining 50%.

On the same day, Frankel, GTP, and FGP entered into a "Participation Agreement" to "define the rights, responsibilities and participation by the Parties in oil and gas prospects presented to FGP . . . and to promote the prospects to the oil and gas industry and/or develop the prospects for the Parties' own accounts . . . ." Under the Participation Agreement, each party was required to immediately notify the other parties of the presentation of a prospect to FGP and furnish associated information. The Participation Agreement also contained mutual non-compete

3

covenants, which were in effect during the term of the agreement and an additional two years after all parties' interests in a prospect had terminated.

According to Frankel, it offered Grimes and Texas Standard the opportunity to join FGP because of their experience in marketing oil and gas prospects. In the Participation Agreement, the parties referenced that experience and recited Grimes and Texas Standard would use their "best efforts" to market such prospects.

The evidence indicates that PetroVal's expertise relative to its contribution involved services related to seismic and geologic data for generation and development of prospects. Contemporaneously with execution of the Participation Agreement, FGP and PetroVal signed a "Consulting Services Retainer Agreement" ("the Retainer Agreement") in which PetroVal agreed to provide such services and use data exclusively for FGP in performance of the Participation Agreement and hold data in confidence.

The Participation Agreement contained a provision requiring the parties to pay "cash calls," prescribing procedures in the event of default on cash calls, and essentially providing that a party who failed to timely pay three cash calls forfeited all rights to participate in prospects generated by the data for which the cash calls were required. FGP entered into a separate agreement with another company for seismic-data licenses, which also required payment of cash calls.

After its formation, FGP acquired interests in certain offshore prospects through purchase, assignment, or farmout. In October 2007, GTP notified Frankel that it was in default for failing to satisfy multiple cash calls. According to Frankel, GTP used Frankel's default as a subterfuge for pushing Frankel out of FGP and excluding Frankel from development of prospects. Without informing Frankel, GTP had already engaged in discussions with Scott Broussard of Cutter

4

Energy as a replacement for Frankel. GTP and Cutter Energy eventually formed a new company, Trifecta Oil & Gas, LLC ("Trifecta"). Frankel claims that, via Trifecta, GTP sought to develop prospects which had been acquired by FGP, pursue prospects which otherwise would have been pursued by FGP, and utilize seismic data which should have been used for promoting FGP prospects.

GTP essentially maintains it approached Broussard to seek the liquidity that Frankel failed to provide, Frankel misrepresented its ability to shoulder its share of FGP's financial burdens, and Frankel hid cash calls from GTP. In contrast, Frankel asserts that, over a year into the parties' relationship, Grimes and Texas Standard had not attempted to market any prospects acquired through FGP, which caused Frankel concern about continuing to contribute its share of funding for FGP's operations.

In any event, in December 2007, another company filed an involuntary bankruptcy proceeding against Frankel in an unrelated matter. GTP intervened in the bankruptcy proceeding as creditors of Frankel, claiming it was liable for various seismic charges on prospects acquired by the parties and defaulted on cash calls. In response, Frankel disputed GTP's claims and contended GTP breached the Participation Agreement and Frankel was entitled under that agreement for compensation relative to several prospects.

On March 31, 2008, GTP and Frankel executed a "Settlement Agreement and Release of All Claims" ("the Settlement Agreement"). The Settlement Agreement terminated the parties' relationship as to FGP except for continuing to hold existing seismic licenses. In the Settlement Agreement, GTP agreed to pay $135,000, and assign certain interests, to Frankel. Frankel agreed it would assign to GTP, or relinquish its interest in, certain FGP prospects. The Settlement

Agreement also contained broad mutual release provisions relative to various claims, including "fraud in the inducement of this Agreement."[2]

When the Settlement Agreement was executed, GTP was already engaged, via Trifecta, in negotiations to sell certain prospects to Probe Resources US Ltd. ("Probe"), of which Broussard was president and CEO. The potential sale involved prospects which, according to Frankel, were acquired by or should have been pursued on behalf of FGP, including some prospects in which Frankel relinquished its interest in the Settlement Agreement. Frankel claims GTP used its intervention in the bankruptcy proceeding as a tool for pressuring Frankel to relinquish its interest in these prospects so that GTP could obtain clean title and effectuate the Probe transaction. It is undisputed that, before execution of the Settlement Agreement, GTP failed to disclose the potential Probe transaction to Frankel based on concern Frankel would not execute the Settlement Agreement if it knew about the sale, and Frankel was not otherwise aware of the sale. Approximately two months after execution of the Settlement Agreement, Trifecta sold six prospects to Probe in a multi-million dollar transaction.

Frankel used some of the assets that it received pursuant to the Settlement Agreement to settle the bankruptcy matter with its unrelated creditor. However, both parties presented evidence of payments or transfers purportedly required under the Settlement Agreement that were not effected or were untimely.

---

[2] We hereinafter refer to Frankel's release of claims for fraudulent inducement as "the fraudulent-inducement release" to distinguish it from the entire "release" containing the provision.

## B.       The Suit

In 2008, Frankel sued GTP, asserting various causes of action and essentially seeking to recover lost profits due to its nonparticipation in the Probe transaction.

Frankel alleged that GTP and PetroVal breached, respectively, the Participation Agreement and the Retainer Agreement by (1) failing to utilize seismic data and their best efforts to market prospects on behalf of FGP, (2) forming Trifecta, and (3) utilizing seismic data and marketing FGP's prospects for GTP's own benefit, through Trifecta, to the exclusion of Frankel.

Frankel alleged that GTP breached fiduciary duties to Frankel by (1) using FGP's confidential information for GTP's own benefit, to the exclusion and detriment of Frankel, (2) concealing that GTP had formed Trifecta and was negotiating the sale to Probe, and (3) misrepresenting in the Settlement Agreement that GTP owned, and had the ability to assign to Frankel, a certain interest in a prospect—High Island Block A-96—as purportedly promised therein.  Frankel also pleaded that GTP fraudulently induced Frankel to execute the Settlement Agreement via these latter two actions or omissions.

Frankel further alleged that GTP engaged in a conspiracy to commit the above-described conduct.

Frankel sought rescission of the Settlement Agreement, actual damages, punitive damages, and imposition of a constructive trust on all profits, proceeds, funds, and property obtained by GTP via its alleged breach of fiduciary duties.[3]

---

[3] Frankel also sued Broussard, Probe, Warburg Pincus, LLC, and the principals of GTP. GTP and its principals were the only remaining defendants at the time of trial, but no recovery was ordered against the principals.  Further, Frankel Resources, LLC, was named as a plaintiff,

Among other affirmative defenses, GTP pleaded that Frankel released all its claims. GTP also filed a counterclaim, alleging Frankel breached the Settlement Agreement; or, alternatively, if the Settlement Agreement were rescinded, requesting a declaratory judgment that Frankel forfeited its interests in prospects sold to Probe. GTP filed a third-party claim against Frankel's principal, Scott Frankel, asserting he is liable under an alter-ego theory for Frankel's obligations.

## C.    The Jury Findings

A jury heard extensive evidence during a two-week trial and the jury charge consisted of twenty-five questions.[4]

The jury made the following findings relative to Frankel's various claims:

### Breach of the Participation Agreement

The jury found each GTP entity breached the Participation Agreement and assessed total damages of $342,717, representing the value of the interest Frankel was entitled to receive in the Probe transaction less any expenses it would have incurred in connection with the transaction. However, the jury also found GTP's breach was excused by Frankel's prior material breach, which was not excused.

### Breach of the Retainer Agreement

The jury found that PetroVal breached the Retainer Agreement but declined to assess any damages, in the same category that was submitted to the jury relative to breach of the Participation Agreement—the value of the interest Frankel was entitled to receive in the Probe transaction less any expenses it would have incurred in connection with the transaction.

---

but only Frankel Offshore Energy, Inc. is a party to the judgment. Therefore, we will discuss only the causes of action between GTP and Frankel Offshore Energy, Inc., the entity we refer to as "Frankel."

[4] Because some legal issues remained outstanding when the charge was submitted, the trial court refrained from predicating the jury's answers to some questions on its answers to other questions; instead, the trial court submitted all relevant factual inquiries it would need to later resolve the legal issues.

### Breach of Fiduciary Duty

The trial court instructed the jury that GTP owed Frankel a fiduciary duty. The jury found that each GTP entity breached its fiduciary duty, Frankel had "unclean hands," and each GTP entity did not "knowingly" participate in the breach. The jury declined to assess any damages for breach of fiduciary duty in the two categories that were submitted to the jury: (1) the value of the interest Frankel was entitled to receive in the Probe transaction minus any expenses Frankel would have incurred in connection with that transaction; and (2) "the amount of profit, if any, obtained by any Defendant in connection with" its breach of fiduciary duty.

### Conspiracy

The jury found that none of the GTP entities were part of a conspiracy that damaged Frankel.

### Punitive Damages

Because the jury assessed no damages for breach of fiduciary duty and did not find a conspiracy, it did not answer the question inquiring whether the harm to Frankel from GTP's breach of fiduciary duty and/or conspiracy resulted from "malice or fraud" on GTP's part.

### Fraudulent Inducement

The trial court instructed the jury that the fraudulent-inducement release did not bar Frankel's fraudulent-inducement claim. The jury found that at least one GTP entity fraudulently induced Frankel into signing the Settlement Agreement.

With respect to GTP's counterclaim, the jury found that each GTP entity materially breached the Settlement Agreement but the breach was excused, Frankel materially breached the Settlement Agreement but its breach was excused, and GTP breached the agreement first. The jury assessed $18,000 in damages for Frankel's breach.[5] With respect to GTP's third-party claim, the jury found Scott

---

[5] Frankel also pleaded that GTP breached the Settlement Agreement, but no jury question was submitted for the jury to assess damages, apparently consistent with Frankel's request for rescission. Rather, relative to contract claims, Frankel proceeded to the jury solely on the alleged breaches of the Participation Agreement and the Retainer Agreement.

Frankel was "responsible" for Frankel's conduct, which, based on accompanying instructions, meant that, among other elements, Scott Frankel "caused [Frankel] to be used for the purpose of perpetuating and did perpetuate an actual fraud on FGP primarily for the direct personal benefit of Scott Frankel."

Finally, the jury found the same amount of reasonable attorneys' fees each for Frankel and GTP: $1,000,000 for trial; $250,000 for appeal to a court of appeals; and $50,000 for appeal to the Supreme Court of Texas.

## D. Post-Trial Proceedings and Judgment

If judgment had been rendered in conformity with the jury's verdict, Frankel would not have been entitled to any monetary recovery because the jury found no liability, declined to assess damages, or found that GTP prevailed on an affirmative defense, on all Frankel's claims for damages. However, Frankel filed a post-trial motion asking the trial court to rescind the Settlement Agreement based on the jury's finding it was fraudulently induced and award more than $8 million for equitable disgorgement based on the jury's finding that GTP breached fiduciary duties.

In its response and own post-trial motion, GTP argued that rescission of the Settlement Agreement was improper because, among other grounds, Frankel released its fraudulent-inducement claim. GTP requested judgment of $18,000 plus attorneys' fees in its favor based on the finding that Frankel breached the Settlement Agreement. GTP also advanced various grounds in opposition to Frankel's request for equitable disgorgement.

10

On December 8, 2010, the trial court signed an Amended Final Judgment,[6] granting Frankel's requests for rescission and equitable disgorgement, rendering a take-nothing judgment on all other claims and counterclaims, and explaining its rulings:

### *Rescission of the Settlement Agreement*

The trial court concluded the fraudulent-inducement release was unenforceable because the parties were fiduciaries pursuant to Delaware law; therefore, the Settlement Agreement was not an arm's length transaction. The trial court further concluded that a fraudulent-inducement release between fiduciaries is enforceable only if they first contractually disavow their respective fiduciary duties. The trial court also rejected GTP's other grounds for opposing rescission. Accordingly, the trial court ordered rescission of the Settlement Agreement and required each party to return payments and interests received pursuant to the Settlement Agreement.

### *Equitable disgorgement*

The trial court recited that it had discretion to grant Frankel's request for equitable disgorgement of GTP's profits resulting from its breach of fiduciary duties but awarded less than the amount requested based on the jury's finding that Frankel had unclean hands. The court also noted that the jury's "no" answers to questions asking whether GTP acted with malice or fraud, or knowingly breached fiduciary duties, had "no bearing" on the decision to award equitable disgorgement. The trial court ordered that Frankel recover a total of $4,010,175.06 for equitable disgorgement, allocated as follows: $1,359,643.55 from Grimes;

---

[6] The trial court originally signed a final judgment but then signed the Amended Final Judgment (the operative judgment) solely to correct a party's name.

$1,970,959.73 from PetroVal; and $679,571.78 from Texas Standard. The trial court also awarded post-judgment interest on this recovery.

### *Take-nothing orders*

The trial court ordered that Frankel take nothing on all of its other claims consistent with the jury findings, as recited above.

Having rescinded the Settlement Agreement, the trial court disregarded the jury findings regarding breach of the Settlement Agreement and ordered that GTP take nothing on its counterclaim for Frankel's breach. The trial court also ordered that GTP take nothing on its request for a declaratory judgment. Because of these rulings, the trial court stated that the finding Scott Frankel is an alter ego of Frankel was irrelevant.

Finally, the trial court denied all parties' request for attorneys' fees because no party was awarded damages on a claim for which attorneys' fees are recoverable.

GTP filed a post-judgment motion, requesting the trial court to rule whether the disgorgement award is punitive or compensatory in nature because the characterization affected applicability of settlement credits and the amount of GTP's supersedeas bond. The trial court signed an order stating the disgorgement award is "punitive in nature." GTP timely filed a motion to modify the judgment or alternatively motion for new trial, which the trial court denied by written order.

## II. ANALYSIS

In three issues, GTP contends (1) the trial court erred by rescinding the Settlement Agreement because the fraudulent-inducement release was enforceable even if the parties were fiduciaries, (2) the trial court erred by concluding the parties had a fiduciary relationship, and (3) the equitable-disgorgement award violated various procedural and substantive principles.

GTP advances its first issue, challenging rescission of the Settlement Agreement, to support the full relief GTP requests on appeal: (1) reversal of the rescission order and concomitant requirement that the parties return benefits received under the Settlement Agreement; (2) reversal of the equitable-disgorgement award against GTP on the ground that, in the Settlement Agreement, Frankel released the underlying claim for breach of fiduciary duties; and (3) judgment in GTP's favor for $18,000, plus attorneys' fees, based on the jury's finding that Frankel breached the Settlement Agreement. Apparently, GTP's second and third issues are alternative contentions because prevailing on only one or more of these contentions would entitle GTP to reversal of the equitable-disgorgement award but not necessarily the order of rescission.

For the reasons set forth below, we hold the trial court erred by rescinding the Settlement Agreement because the fraudulent-inducement release precluded all of Frankel's fraudulent-inducement claims that are supported by the evidence. We will first set forth our reasoning for this holding and then apply our holding to address the appellate relief requested by GTP.

## A. Applicable Law

*Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008), and *Italian Cowboy Partners, Ltd. v. Prudential Insurance Co. of America*, 341 S.W.3d 323 (Tex. 2011) are the seminal cases on enforceability of a disclaimer of reliance or other provision in a settlement agreement waiving a fraudulent-inducement claim. In *Schlumberger*, the court emphasized that the principle recited in earlier cases recognizing fraud vitiates a contract must be weighed against the competing concern that parties should be able to fully and finally resolve their disputes by

13

bargaining for and executing a release barring all further disputes. 959 S.W.2d at 179. Citing this latter concern, the court held, "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Id.* at 181.

The court further remarked that a disclaimer will not always preclude a fraudulent-inducement claim. *Id.* However, on the particular *Schlumberger* record, the disclaimer conclusively negated the reliance element of the claim. *Id.* In support, the court considered the language of the disclaimer under well-established rules of contract construction and circumstances surrounding its formation. *Id.* at 179–80. The plaintiffs clearly disclaimed reliance on representations by the defendant about the subject matter of the agreement containing the disclaimer. *Id.* at 180. Other pertinent factors were that the parties executed the agreement to end their "deal" and resolve a dispute regarding the project at issue, both were represented by highly competent legal counsel, the parties dealt at arm's length, and both were "knowledgeable and sophisticated business players." *Id.*

Later, in *Forest Oil*, the court upheld a disclaimer of reliance in a settlement agreement that was intended to resolve both past and future claims. 268 S.W.3d at 53–54, 56–58. The court reaffirmed that facts may exist showing such a provision lacks "'the requisite clear and unequivocal expression of intent necessary to disclaim reliance'" but stated a court must always examine the contract and totality of the circumstances to determine if the disclaimer is binding. *Id.* at 60 (quoting *Schlumberger*, 959 S.W.2d at 179). Because courts of appeals had seemingly disagreed since *Schlumberger* on which factors were most relevant, the *Forest Oil* court held that the following should guide a decision on enforceability of a

14

disclaimer of reliance: "(1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear." *Id.* The court also observed that, if the parties, like those in *Schlumberger*, are effecting a "once and for all" settlement of claims, such fact may also support enforcement of a fraudulent-inducement release. *Id.* at 58.

Subsequently, in *Italian Cowboy*, the court highlighted what the *Forest Oil* court had enumerated as the fifth "factor" and stated that whether the parties expressed a "clear and unequivocal" intent to disclaim reliance on representations or to waive fraudulent-inducement claims is a threshold requirement which must be satisfied before consideration of the circumstances surrounding contract formation (the other *Forest Oil* factors). *See Italian Cowboy*, 341 S.W.3d at 331–37 & n.4, n.8; *see also Allen v. Devon Energy Holdings*, L.L.C., 367 S.W.3d 355, 382 (Tex. App.—Houston [1st Dist.] 2012, pet. filed) (citing *Italian Cowboy* when stating that clarity requirement is threshold hurdle which must be passed for enforcement of disclaimer and provision lacking clear and unequivocal disclaimer will not preclude fraudulent inducement claim regardless of surrounding circumstances).[7]

---

[7] The *Italian Cowboy* court did not specify whether the clarity consideration, in addition to constituting a threshold requirement for enforceability, also remains part of the additional analysis of examining the "totality of the circumstances"; i.e., weighing clarity of the provision along with the extrinsic factors concerning contract formation to determine whether a provision which is sufficiently clear to pass the threshold hurdle is otherwise enforceable. *See Allen*, 367 S.W.3d at 383 n.26. However, we agree with the *Allen* court that the clarity consideration remains a factor for determining enforceability of the provision because clarity is plainly one of the circumstances encompassed in a "totality of the circumstances" test. *See id.*

Finally, whether a provision constitutes an adequate release of fraudulent-inducement claims is a question of law. *See Italian Cowboy*, 341 S.W.3d at 333 (citing *Schlumberger*, 959 S.W.2d at 181).

**B.  Application of Law to Fraudulent-Inducement Release in the Present Case**

GTP contends that application of the *Forest Oil* factors militates enforcement of the fraudulent-inducement release in the present case and the trial court erred by ruling that the release was unenforceable because the parties were fiduciaries. On appeal, Frankel urges the trial court's reasoning was correct, but Frankel also advances alternative grounds for upholding the trial court's ruling that the provision at issue does not preclude Frankel's request for rescission based on fraudulent inducement: (1) any fraudulent-inducement release is unenforceable by Grimes because it was not a party to the Settlement Agreement; (2) the provision fails to satisfy the "clear and unequivocal" intent requirement and the *Forest Oil* factor pertaining to negotiation of the contract and application of all factors weighs against enforcement; and (3)  even if the provision is an enforceable release of Frankel's claim based on extra-contractual fraud, the provision is inapplicable to Frankel's claim based on misrepresentations within the Settlement Agreement itself.

**1.  Grimes as a party to the Settlement Agreement**

Preliminarily, we address Frankel's assertion that there was no release of the "Grimes" entity which is a party to the present case because it was not a party to the Settlement Agreement. As Frankel notes, the entity named as a party at the outset of the Settlement Agreement and a signatory thereto is "Grimes Energy, Inc.," whereas the party to the present case is "Grimes Energy Co." David Grimes, the principal of "Grimes Energy Co.," testified the name on the Settlement

16

Agreement was a mistake and "Grimes Energy, Inc." did not exist. Thus, Frankel suggests it did not release "Grimes Energy Co." from any claims. We disagree.

In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the instrument. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312–13 (Tex. 2005). Although "Grimes Energy, Inc." did not exist, the Settlement Agreement clearly demonstrates Frankel's intent to contract with the correct entity, "Grimes Energy Co." When reciting at the outset that "Grimes Energy, Inc." was a party to the Settlement Agreement, the parties assigned the moniker "Grimes" to this entity and defined the monikor "GTP" to include "Grimes." The parties then made various references to "Grimes" or "GTP" when reciting the history of the parties' relationship and dispute and setting forth the parties' obligations under the Settlement Agreement, including payments and assignments to be made by "Grimes" and/or "GTP" to Frankel. Accordingly, in the Settlement Agreement, Frankel acknowledged that, irrespective of the misnomer, the actual party thereto was "Grimes Energy Co."; it is undisputed "Grimes Energy Co." is the party with whom Frankel had a relationship and subsequent dispute, and it is axiomatic Frankel did not have a relationship and dispute with, or agree to accept benefits under the Settlement Agreement from, a non-existent entity.

Furthermore, in its live petition, Frankel named both "Grimes Energy, Inc." and "Grimes Energy Company" as defendants, apparently out of caution, to name the actual "Grimes" entity with whom Frankel had a dispute and the "Grimes" entity listed, albeit incorrectly, on the Settlement Agreement. In the petition, Frankel assigned the moniker "Grimes Energy" to both entities. Later in the petition, Frankel alleged that "Grimes Energy . . . signed [the Settlement

17

Agreement] . . . ." We construe this allegation as a judicial admission that "Grimes Energy Co.," the party to the present case, was a party to the Settlement Agreement. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) (stating, "judicial admission must be a clear, deliberate, and unequivocal statement . . . and occurs when an assertion of fact is conclusively established in live pleadings . . . ."). Accordingly, "Grimes Energy Co." enjoys the benefit of any enforceable release of "Grimes" contained in the Settlement Agreement.

## 2. Whether "the release language is clear and unequivocal" and enforceability relative to alleged misrepresentations within the Settlement Agreement

Although the trial court refused to enforce the fraudulent-inducement release based on the "arm's length transaction" factor, we first consider the parties' dispute regarding whether Frankel clearly and unequivocally released fraudulent-inducement claims because this is actually a threshold requirement. *See Italian Cowboy*, 341 S.W.3d at 331–37 & n.4, n.8; *Allen*, 367 S.W.3d at 382. Frankel also argues that any enforceable release of Frankel's claim based on extra-contractual fraud would not preclude Frankel's fraudulent-inducement claim based on GTP's alleged misrepresentations within the Settlement Agreement about an obligation thereunder. We consider these issues together because we conclude that Frankel clearly and unequivocally released fraudulent-inducement claims based on extra-contractual fraud, but not fraudulent-inducement claims based on misrepresentations within the Settlement Agreement. However, the evidence conclusively establishes there were no such misrepresentations in the Settlement Agreement itself.

18

### a. Release of fraudulent-inducement claims based on extra-contractual fraud[8]

The relevant language in the release provides:

> [Frankel] . . . does hereby release, acquit and forever discharge Grimes, Texas Standard and PetroVal . . . from all existing, future, known and unknown claims, demands and causes of action for all existing, future, known and unknown damages and remedies, which have accrued or may ever accrue to [Frankel] . . . for or on account of (i) the claims made by it in the Bankruptcy Proceeding, (ii) any and all claims which might relate in any way to such claims, (iii) any and all claims which were brought or which could have been brought in the Bankruptcy Proceeding or in any other litigation; all of the foregoing shall include, but not be limited to, all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, that are now recognized by law or that may be created or recognized in the future by any manner, including without limitation, by statute, regulation or judicial decision, for past, future, known and unknown personal injuries, property damages, and all other losses, damages or remedies of any kind that are now recognized by law or that may be created or recognized in the future, by any manner, including without limitation, by statute, regulation or judicial decision, including, but not limited to all actual damages, all exemplary and punitive damages, all statutory interest or penalties of any kind, *fraud in the inducement of this Agreement*, and pre- and post judgment interest of any and all claims,

---

[8] Relative to extra-contractual fraud, Frankel cites GTP's alleged concealments or failures to disclose.  Frankel pleaded and emphasizes in its appellate brief that GTP concealed it had formed Trifecta and was negotiating the Probe transaction.  In its appellate brief, Frankel also complains that, before execution of the Settlement Agreement, GTP failed to disclose that GTP (through Trifecta) had renewed a farmout, East Cameron 246 (which was subsequently sold to Probe), using consideration paid by Frankel with no cost to GTP.  The jury was instructed that fraud includes affirmative misrepresentations, concealments, or failures to disclose.  Although Frankel cites GTP's alleged concealments or failures to disclose, our discussion of the fraudulent-inducement release relative to "extra-contractual fraud" includes any extra-contractual actions or omissions which constituted fraud on GTP's part. Our discussion under this subsection is confined to Frankel's fraudulent-inducement claims based on extra-contractual fraud.

19

excepting only such claims as may arise in the future out of the obligations under this Agreement.[9]

(emphasis added).

Frankel advances several reasons why this provision does not contain a clear and unequivocal release of fraudulent-inducement claims.

First, Frankel suggests the above-emphasized phrase "fraud in the inducement of this Agreement," when considered in context of the entire provision, does not clearly express its intent to release fraudulent-inducement claims. As Frankel asserts, it released all claims "for or on account of" three categories of claims enumerated as (i), (ii), and (iii). After identifying the three categories, the provision states, "all of the foregoing shall include . . ." followed by a description of various claims, remedies, or damages, including "fraud in the inducement of this Agreement." Based on this language, Frankel contends it released a claim for "fraud in the inducement of this Agreement" only if the claim fell within one or more of the three categories but Frankel's claim did not fall into any of the categories.

With respect to category (i), Frankel argues its fraudulent-inducement claim was not a "claim[] made by [Frankel] in the Bankruptcy Proceeding."

With respect to category (ii), Frankel argues its fraudulent-inducement claim does not "relate in any way to such claims [made in the Bankruptcy Proceeding]" because Frankel's claims in the Bankruptcy Proceeding involved exclusively its disputes with the unrelated creditor who filed the proceeding.

With respect to category (iii), Frankel argues its fraudulent-inducement claim was not one "brought or which could have been brought in the Bankruptcy

---

[9] For ease in construing portions of the release pertinent to the present issues, we have omitted language stating the release encompassed the parties' assigns, affiliates, officers, agents, etc. because there is no issue involving release of any such other persons or entities.

Proceeding or in any other litigation" because (1) Frankel discovered the fraud after the Bankruptcy Proceeding was dismissed, and (2) the quoted language necessarily means the past tense—claims accruing *before* execution of the Settlement Agreement—but the fraudulent-inducement claim could not have accrued until execution of the Settlement Agreement, at the earliest, and, in fact, did not accrue until Frankel later discovered the fraud.

We conclude that the fraudulent-inducement claim is encompassed in, at least, category (ii)—"any and all claims which might relate in any way to" "the claims made by [Frankel] in the Bankruptcy Proceeding."

First, we reject Frankel's suggestion that "the claims made by [Frankel] in the Bankruptcy Proceeding" involved exclusively its dispute with the unrelated creditor. In construing a contract, we presume the parties intended every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *see Schlumberger*, 959 S.W.2d at 179 (stating that well-established rules of contract construction governed whether provision expressed requisite clear and unequivocal intent to disclaim reliance). We consider the entire writing and attempt to harmonize and give effect to all provisions by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank*, 165 S.W.3d at 312.

If "the claims made by [Frankel] in the Bankruptcy Proceeding" meant only Frankel's dispute with the unrelated creditor, then there was no reason for Frankel to release GTP for those claims. Instead, the parties clearly intended to effect a release of Frankel's claims against GTP, the party to the Settlement Agreement. In the preamble of the Settlement Agreement, the parties recited the basis for their respective claims **against each other** and that they executed the agreement to resolve all of those claims. In fact, Frankel's release is contained in a section of the Settlement Agreement entitled "MUTUAL RELEASES." Therefore, Frankel's

release of GTP for "the claims made by [Frankel] in the Bankruptcy Proceeding" encompassed Frankel's claims against GTP.

Category (ii) is broad: Frankel released GTP for "any and all claims which might relate in any way to" Frankel's claims against GTP in the Bankruptcy Proceeding. Because the parties executed the Settlement Agreement to resolve Frankel's claims against GTP in the Bankruptcy Proceeding, Frankel's claim for fraudulent inducement of the Settlement Agreement "relate[s] in any way to" Frankel's claims against GTP in the Bankruptcy Proceeding. In fact, Frankel does not contend that the fraudulent-inducement claim fails to satisfy category (ii) if category (i) includes Frankel's claims against GTP in the Bankruptcy Proceeding. Frankel merely asserts that category (ii) cannot apply because category (i) means only Frankel's claims against the unrelated creditor. Because we have rejected Frankel's proposed construction of category (i), we also reject its reasoning relative to category (ii).

Moreover, we can conceive of no purpose for the parties to include a release of claims for "fraud in the inducement of this Agreement" other than the sole purpose denoted in this plain language. The language is meaningless if, as posited by Frankel, a claim for fraudulent inducement of this particular Settlement Agreement was released only if it fit within one of the three categories but it could not have possibly fit within one of the categories. Rather, we conclude the parties included the language to express a clear and unequivocal intent to release a claim for fraudulent inducement of the Settlement Agreement and essentially defined such a claim as encompassed within the enumerated categories.

Additionally, Frankel asserts that the phrase "fraud in the inducement of this Agreement" is included within a list of damages and thus he did not expressly

22

release a **"*claim*"** for fraudulent inducement. Frankel refers to the portion of the provision that follows the three categories of released claims:

> all of the foregoing shall include, but not be limited to, all claims . . . for past, future, known and unknown personal injuries, property damages, and all other losses, damages or remedies of any kind . . . including, but not limited to all actual damages, all exemplary and punitive damages, all statutory interest or penalties of any kind, ***fraud in the inducement of this Agreement***, and pre- and post judgment interest of any and all claims . . . .

(emphasis added).

We acknowledge that the phrase "fraud in the inducement of this Agreement" is not directly included in the description of the type of ***claims*** released, but instead is included within the more specific description that follows of the type of "losses, damages or remedies" for which claims are released and then intermingled among a list of various types of damages. However, we must again presume that the parties intended the phrase "fraud in the inducement of this Agreement" to have some effect. *See Heritage Res., Inc.*, 939 S.W.2d at 121. Because fraudulent inducement is not a type of "loss[], damages or remed[y]," the only possible reason for including the phrase is the parties' intent to release any claim for "losses, damages or remedies" ***based on*** "fraud in the inducement of this Agreement," which includes the remedy of rescission.

Next, Frankel contends there is no clear and unequivocal release of fraudulent-inducement claims because, unlike the following *Schlumberger* and *Forest Oil* provisions, Frankel did not expressly or implicitly disclaim reliance on GTP's misrepresentations:

> [E]ach of us . . . expressly warrants and represents and does hereby state . . . and represent . . . that no promise or agreement which is not herein expressed has been made to him or her in executing this

23

release, and that none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment . . . .

*Schlumberger*, 959 S.W.2d at 180.

Each of the Plaintiffs and Intervenors expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it in executing the releases contained in this Agreement, and that none of them is relying upon any statement or any representation of any agent of the parties being released hereby. Each of the Plaintiffs and Intervenors is relying on his, her, or its own judgment . . . .

*Forest Oil*, 268 S.W.3d at 54 n.4.

Although the disclaimer-of-reliance language in *Schlumberger* and *Forest Oil* was sufficient to release the fraudulent-inducement claims in those cases, the Texas Supreme Court has not imposed a requirement that an effective release of fraudulent-inducement claims must contain disclaimer-of-reliance language. *See generally Italian Cowboy*, 341 S.W.3d 323; *Forest Oil*, 268 S.W.3d 51; *Schlumberger*, 959 S.W.2d 171. Rather the *Schlumberger* court stated, "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, *or* one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Schlumberger*, 959 S.W.2d at 181 (emphasis added); *accord Italian Cowboy*, 341 S.W.3d at 332 n.4. In fact, the release in the present case is broader than a disclaimer of reliance because reliance is only one element of a fraudulent-inducement claim. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998).

Finally, Frankel suggests there was no effective fraudulent-inducement release because the Settlement Agreement lacked a merger or integration clause. In *Italian Cowboy*, the court held that a merger clause alone was insufficient to

24

constitute a disclaimer of reliance and thus did not bar fraudulent-inducement claims. 341 S.W.3d at 331–37. However, the court did not hold that an agreement must contain both a merger clause *and* either an express waiver of fraudulent-inducement claims or disclaimer of reliance in order to effect a release of fraudulent-inducement claims. *See id.* In fact, the *Italian Cowboy* court reiterated the supreme court's earlier statement in *Schlumberger* that either of the latter two provisions is effective to release fraudulent-inducement claims. 341 S.W.3d at 332 & n.4 (citing *Schlumberger*, 959 S.W.2d at 179, 181).

In summary, in the Settlement Agreement, the parties clearly and unequivocally expressed their intent to release fraudulent-inducement claims based on extra-contractual fraud.

**b.  Release of fraudulent-inducement claims based on alleged misrepresentations within the Settlement Agreement**

Frankel asserts that no Texas authority has held that a fraudulent-inducement release or disclaimer of reliance is enforceable if the alleged fraud was a misrepresentation in the contract containing the release or disclaimer. Frankel also suggests that the specific language of the release precludes application to misrepresentations within the Settlement Agreement. We need not decide whether a fraudulent-inducement release or disclaimer is generally enforceable when the alleged fraud is a misrepresentation within the contract because we agree the parties in the present case did not express in the Settlement Agreement a clear and unequivocal intent to preclude fraudulent-inducement claims based on such a misrepresentation.

The following phrase is at the end of the release: "excepting only such claims as may arise in the future out of the obligations under this Agreement." The parties did not clearly confine this exception to claims for breach of the Settlement

Agreement. Rather, the broader preservation of claims "aris[ing] . . . out of the obligations" under the Settlement Agreement can be construed as encompassing even a claim for fraudulent inducement based on a misrepresentation within the agreement regarding a party's obligations thereunder.

Frankel relies on a provision in the Settlement Agreement making the following disposition of High Island Block A-96 ("High Island"):

> GTP shall hold its interests in . . . High Island Block A-96 in trust for the benefit of [Frankel] until November 1, 2009. At any time prior to November 1, 2009, upon [Frankel's] request, GTP shall immediately assign (or cause to be assigned) to [Frankel] all of their right, title and interest in and to High Island Block A-96 (being an undivided seventy-five percent interest) . . . .

Frankel contends GTP misrepresented its ownership interest, and ability to assign that interest, in High Island because record title to 60% of the referenced 75% interest was owned by Texas Standard Oil & Gas Company ("TSO"), a related but separate entity from Texas Standard Oil & Gas, L.P. (the party to the Settlement Agreement and the present case) and GTP knew that TSO was in bankruptcy and unable to transfer title to Frankel without approval of the bankruptcy court.

GTP responds that it did not make such misrepresentations because it held a beneficial interest in High Island at the time the Settlement Agreement was executed and had the ability to "cause to be assigned" its interest. We construe GTP's argument as a challenge to legal sufficiency of the evidence supporting the jury's implicit finding that GTP made misrepresentations within the Settlement Agreement.[10]

---

[10] In its original appellate brief, GTP did not specifically address alleged misrepresentations in the Settlement Agreement. GTP specifically addressed this issue in its

When reviewing a legal-sufficiency contention, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). We hold the evidence conclusively establishes GTP did not make the misrepresentation alleged by Frankel.

The gist of Frankel's complaint is that GTP misrepresented that it owned 75% record title in High Island and thus misrepresented it had the ability to assign 75% record title to Frankel. We disagree. At trial, the principals of both Grimes and Texas Standard indeed acknowledged that GTP owned record title to 15% of High Island but record title to the other 60% of the 75% "interest" referenced in the Settlement Agreement was owned by TSO. However, according to the undisputed

reply brief, to respond to an argument in Frankel's appellate brief. Frankel suggests that, in GTP's opening brief, it was required to challenge legal sufficiency of the evidence supporting the jury's implied finding of misrepresentations in the Settlement Agreement. We disagree. In its original brief, GTP challenged the specific ground on which the trial court refused to enforce the fraudulent-inducement release—the fiduciary status. GTP argued that the trial court's conclusion was erroneous and the release is enforceable under applicable law. GTP also suggested that the trial court's error probably caused rendition of an improper judgment. Accordingly, GTP met the burden required of GTP in its original brief.

27

testimony of Grimes and Texas Standard, GTP held a beneficial interest in the 60% pursuant to a nominee agreement. Grimes testified that GTP's representation in the Settlement Agreement regarding its interest in High Island was true, explaining that TSO held "bear [sic] record title" but the entities comprising GTP owned a beneficial interest: "There's a record title and there's a beneficial or equitable title, whatever you call that, but it was being held for the benefit of other parties by [TSO], and it had full authority to assign it out to those parties." Timothy Roberson, Texas Standard's principal, concurred, testifying that Texas Standard held beneficial title to High Island.

In support, the evidence shows that High Island was a federal lease. At the time the federal government accepted bids for High Island, Texas Standard was not qualified to purchase federal leases. Hence, TSO, which was qualified, entered into a nominee agreement with Texas Standard in August 2007, in which TSO agreed to purchase the lease on behalf, and as nominee, of Texas Standard. In the nominee agreement, TSO agreed that, if it were awarded the High Island lease, it would promptly assign the lease to Texas Standard, which agreed to become qualified to hold federal leases, although TSO had not yet assigned the lease to Texas Standard when the Settlement Agreement was executed.

Accordingly, the undisputed evidence shows that GTP did not hold 75% record title to High Island at the time the Settlement Agreement was executed but did hold at least a 75% beneficial interest. However, contrary to Frankel's suggestion, GTP did not represent in the Settlement Agreement that it held 75% record title. Instead, GTP promised to, upon Frankel's request, "immediately assign (or cause to be assigned) . . . all of [GTP's] right, title and interest in and to High Island Block A-96 (being an undivided seventy-five percent interest) . . . ."

28

This promise cannot be construed as a representation that GTP held 75% record title but rather an agreement to "immediately assign (or cause to be assigned)" whatever "right, title and interest" GTP held, which GTP then defined as "an undivided seventy-five percent *interest*." (emphasis added).

We afford words used in a contract their plain, ordinary, and generally accepted meaning unless the contract shows the words were used in a different sense. *Heritage Res., Inc.*, 939 S.W.2d at 121; *see Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also See City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011) ("[T]he doctrine of *inclusio unius* . . . is the presumption that purposeful inclusion of specific terms in a writing implies the purposeful exclusion of terms that do not appear."). The parties did not include any words in the Settlement Agreement modifying "interest" or specifying what type of "undivided seventy-five percent interest" GTP held. "Interest," by itself, is a broad term and encompasses a multitude of property rights, including "beneficial interest." *See Milner v. Milner*, 361 S.W.3d 615, 620–21 (Tex. 2012) (explaining "'beneficial interest' is profit, benefit or advantage resulting from contract or ownership of estate as distinct from legal ownership or control"); Black's Law Dictionary 885 (9th ed. 2009) (defining "beneficial interest" as "[a] right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing."). Because GTP owned a 75% beneficial interest, any representation in the Settlement Agreement that GTP owned "an undivided seventy-five percent interest" was not false.

Frankel's contention that GTP misrepresented in the Settlement Agreement its ability to assign 75% record title to High Island hinges on Frankel's contention that GTP misrepresented that it owned 75% record title. Because GTP did not

represent it owned 75% record title, it did not misrepresent that it could "immediately assign, or cause to be assigned" 75% record title, as suggested by Frankel.[11]

In summary, the evidence conclusively establishes that GTP did not fraudulently induce Frankel to execute the Settlement Agreement based on any misrepresentation in the agreement. Accordingly, we reject Frankel's contention that the fraudulent-inducement release does not preclude all of Frankel's fraudulent-inducement claims because GTP committed a form of fraud which was not encompassed within the release.

### 3.    Extrinsic *Forest Oil* factors

Having concluded the Settlement Agreement satisfies the "clear and unequivocal intent" requirement relative to extra-contractual fraud and that there was no misrepresentation within the Settlement Agreement, we turn to the extrinsic *Forest Oil* factors. Frankel does not dispute it was represented by counsel during

---

[11] We acknowledge that only Texas Standard, not the other two GTP entities, was a party to the nominee agreement with TSO, although Grimes testified that GTP paid for the record title held by TSO. However, on appeal, Frankel does not argue that the other two GTP entities made a misrepresentation because they lacked *any* interest in 60% of the referenced 75%. Instead, the focus of Frankel's complaint is the "record title" aspect of his contention, not any distinction between GTP entities relative to their interest; i.e., Frankel complains (albeit incorrectly) that the GTP entities represented in the Settlement Agreement they held, and would "immediately assign (or cause to be assigned)," record title to Frankel, irrespective of which particular GTP entity allegedly held the record title and would effect the transfer.

Further, even if GTP had promised to "immediately assign (or cause to be assigned)" record title to Frankel, Frankel complains that GTP misrepresented its ability to make the assignment because not only did TSO (rather than GTP) own record title but also TSO was in bankruptcy and could not effect a transfer without approval of the bankruptcy court. However, contrary to Frankel's suggestion, TSO's bankruptcy petition was filed in June 2008—three months after execution of the Settlement Agreement. Thus, GTP could not have misrepresented its ability to "immediately assign (or cause to be assigned)" record title in High Island because such interest was tied up in any bankruptcy proceeding. Nonetheless, GTP did not promise to "immediately assign (or cause to be assigned)" record title.

negotiation and execution of the Settlement Agreement and Frankel was knowledgeable about business matters. However, Frankel contends the release does not entirely satisfy the factor pertaining to negotiation of the Settlement Agreement or the "arm's length transaction" factor and further argues that application of all factors weighs against enforcement.

> **a.  Whether "the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute"**

We will consider this factor next because it is also pertinent to our application of the "arm's length transaction" factor.

There is nothing boilerplate about the Settlement Agreement; the contract is clearly unique to the parties' relationship and dispute. Indeed, Frankel does not contest that the Settlement Agreement was negotiated. Rather, Frankel contends that, during negotiations, the parties did not "specifically discuss[] the issue which has become the topic of" the present dispute because such topic is the Probe transaction and it is precisely this information that GTP concealed from Frankel in order to induce the Settlement Agreement.

We acknowledge that the present case seems to present an atypical situation because the extra-contractual concealments forming the grounds for Frankel's fraudulent-inducement claim are the same concealments forming, in part, the grounds for its breach-of-fiduciary-duties claim. Thus, if the parties had discussed the exact grounds on which Frankel based its present breach-of-fiduciary-duties claim, there likely would not have been any fraudulent inducement because Frankel would not have executed the Settlement Agreement if it had known of the Probe transaction or at least that GTP was concealing material information.

31

However, the *Forest Oil* court did not opine that the parties must have discussed the exact grounds that form the basis of the subsequent dispute, in order to satisfy this factor. *See generally*, 268 S.W.3d at 58. In fact, Frankel released all "known and unknown" claims "which have accrued or may ever accrue to [Frankel] . . . ."

Although Frankel was unaware of the Probe transaction when it executed the Settlement Agreement, an "issue" in both the earlier and present disputes is whether Frankel had an interest in various prospects. Specifically, the earlier dispute involved GTP's claim that Frankel defaulted on various charges or cash calls and thus forfeited its interest in certain prospects versus Frankel's denial it was in default, claim to an interest in certain prospects, and claim that GTP breached the Participation Agreement. When resolving this dispute, the parties, among other agreements, terminated their relationship as FGP and Frankel relinquished its interest in certain prospects and any associated claims. Frankel now claims an interest in prospects subsequently sold to Probe which purportedly were FGP prospects or should have been pursued on behalf of FGP, including some in which Frankel relinquished its interest in the Settlement Agreement. Accordingly, the fact that the parties discussed an issue central to both the earlier and present disputes supports a conclusion that the Settlement Agreement, with its release of future claims including fraudulent inducement, was freely negotiated.

b. **Whether "the parties dealt with each other in an arm's length transaction"**

The trial court concluded that that fraudulent-inducement release was unenforceable as a matter of law because the parties were fiduciaries and thus did not "deal[] with each other in an arm's length transaction." The trial court concluded such a provision is enforceable only if the parties first contractually disavow a fiduciary relationship.

32

The parties dispute whether they ever had a fiduciary relationship in the first place. We will assume, solely for purposes of deciding enforceability of the fraudulent-inducement release, that the parties had a fiduciary relationship relative to their operation of FGP and performance of the Participation Agreement.[12] But the parties also dispute whether they still owed each other any fiduciary duties during negotiation and execution of the Settlement Agreement and thus whether it was an arm's length transaction.

GTP suggests the parties no longer owed each other any fiduciary duties because they had become adverse litigants (via GTP's intervention in the bankruptcy proceeding) when they executed the Settlement Agreement. In contrast, Frankel cites Delaware and Texas authority for the proposition that fiduciaries continue to owe each other duties even when their relationship has become adverse or litigious. *See Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*, Civil Action No. 5502-CS, 2011 WL 3505355, at *31 (Del. Ch. Aug. 8, 2011) ("As a matter of settled law, it is clear that the existence of a conflict does not absolve a governing fiduciary of responsibility for acting in its own self-interest."); *Schlumberger*, 959 S.W.2d at 175 (recognizing that in *Johnson v. Peckham*, 120 S.W.2d 786 (Tex. 1938), court held "partner selling his interest to

---

[12] According to Frankel, Delaware law imposes a default fiduciary relationship on members of an LLC unless that relationship is affirmatively disclaimed by the members. Under a section entitled "**Administration of this Agreement.**," the Participation Agreement contained a provision entitled "**No Fiduciary Relationship**," which stated, "Nothing in this Agreement is intended to create a partnership, joint venture, agency, or other relationship creating fiduciary or quasi-fiduciary duties or similar duties and obligations . . . ." Among other reasons, Frankel contends this provision was insufficient to disclaim the default fiduciary relationship because the Participation Agreement was not the operating agreement for the LLC and this language was not an affirmative disclaimer. GTP disagrees with Frankel's characterization of Delaware law but alternatively contends this language was sufficient to disclaim any fiduciary duties. We need not decide whether the parties had a fiduciary relationship relative to their operation of FGP and performance of the Participation Agreement because we conclude existence of such a relationship did not preclude enforcement of the fraudulent-inducement release.

another partner has a fiduciary duty requiring full disclosure of all important information about the value of the interest . . . even though the partners had strained relations and one partner had sued for an accounting and dissolution of the partnership"); *Johnson*, 120 S.W.2d at 788 ("If the existence of strained relations should be suffered to work an exception, then a designing fiduciary could easily bring about such relations to set the stage for a sharp bargain."). Therefore, Frankel maintains that, during negotiation of the Settlement Agreement, GTP owed Frankel a duty to disclose the potential Probe transaction. Frankel suggests that mere existence of this duty to disclose automatically vitiated any fraudulent-inducement release. We disagree. Rather, we conclude that, even if execution of the Settlement Agreement was not entirely an arm's length transaction because GTP still owed Frankel some fiduciary duty to disclose, existence of such fiduciary relationship did not automatically vitiate the fraudulent-inducement release.[13]

First, based on the general rationale for upholding a fraudulent-inducement release or disclaimer of reliance, we refuse to adopt a blanket rule that such a provision in a settlement agreement between fiduciaries is unenforceable. As the *Forest Oil* court emphasized:

> Refusing to honor a settlement agreement—an agreement highly favored by the law—under these facts would invite unfortunate consequences for everyday business transactions and the efficient settlement of disputes. After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements—*more than that, promise that they have in fact not relied upon such statements*—should be held to their word. . . . If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even

---

[13] We also need not address whether GTP owed Frankel fiduciary duties during negotiation and execution of the Settlement Agreement because existence of such duties did not necessarily vitiate the fraudulent-inducement release.

among the most knowledgeable parties advised by the most knowledgeable legal counsel, is grievously impaired.

*Id.* at 60–61 (emphasis in original) (citations omitted). Axiomatically, fiduciaries, like any other business associates, might wish to ensure finality to their disputes. Thus, their expressed intent to ensure finality, via a fraudulent-inducement release or disclaimer of reliance, as well as their freedom to contract, should be accorded the same respect as the intent of other parties. *See id.*

Further, Frankel cites no authority from the Texas Supreme Court or our court holding that a fraudulent-inducement release or disclaimer of reliance in a settlement agreement between fiduciaries is *per se* unenforceable. The trial court and Frankel suggest that *Schlumberger* and *Forest Oil* stand for such a proposition. In *Schlumberger*, the court indeed addressed enforceability of a disclaimer of reliance only after concluding the parties were not fiduciaries and thus dealt with each other in an arm's length transaction. *See* 959 S.W.3d at 175–77. The court first indicated that it considered this preliminary issue because both parties raised the issue as relevant to enforceability of the disclaimer; the party urging enforcement emphasized the transaction was arm's length. *See id.* at 175–81. The court did not directly state whether it would have addressed the fiduciary issue if neither party had raised it. *See id.* However, the court later indicated that lack of a fiduciary relationship was integral to the court's decision to uphold the disclaimer. *See id.* at 181 ("As there is no evidence of a fiduciary or confidential relationship, the trial court correctly rendered a judgment . . . against [the plaintiffs] on their claims of breach of fiduciary duty and fraudulent inducement."). In any event, the court did not expressly hold that a disclaimer between fiduciaries is *per se* unenforceable. *See id.* at 175–81.

Nonetheless, when the *Forest Oil* court subsequently more clearly defined existence of an arm's length transaction as a relevant consideration, the court did not expressly hold that a disclaimer is enforceable only if the settlement agreement resulted from an arm's length transaction or otherwise hold that a disclaimer between fiduciaries is unenforceable. *See* 268 S.W.3d at 60. To the contrary, the *Forest Oil* court referred to the five considerations listed therein as "facts . . . that guided our reasoning [in *Schlumberger*]" and "factors . . . present in *Schlumberger* and [in *Forest Oil*]"—not elements that all must be established for enforceability of a disclaimer. *Id.* at 60. Although, as mentioned above, the *Italian Cowboy* court subsequently expressed that a "clear and unequivocal" expression of the parties' intent to disclaim reliance on representations or to waive fraudulent-inducement claims is an initial requirement, *see* 341 S.W.3d at 336, 337 n.8, the other extrinsic considerations regarding the circumstances surrounding contract formation are "factors"—not requisites for enforceability of a disclaimer. *See Italian Cowboy*, 341 S.W.3d at 336, 337 n.8; *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 332–33 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (enforcing disclaimer-of-reliance clause with only "scant" evidence regarding extent of complaining party's representation by counsel when all other *Forest Oil* considerations were satisfied and stating that even if complaining party was not represented by counsel, *Forest Oil* considerations are factors rather than elements); *Allen*, 367 S.W.3d at 384 (stating that disclaimer of reliance may be upheld even when all extrinsic factors are not satisfied).[14]

---

[14] Frankel also argues that the present case is similar to *Harris v. Archer*, 134 S.W.3d 411 (Tex. App.—Amarillo 2004, pet. denied). In *Harris*, during negotiation of a settlement agreement to dissolve a partnership, the defendant failed to disclose he was engaged in negotiations to sell certain partnership property to a third party. *Id.* at 422–23. Several days after execution of the settlement agreement, in which the defendant purchased the other partner's

Moreover, as GTP asserts, the *Forest Oil* court did not prescribe the "one-dimensional" requirement for the "arm's length transaction" factor advocated by Frankel and the trial court. Specifically, the court did not foreclose the possibility that, considering all the circumstances, negotiation of a fraudulent-inducement release between fiduciaries might bear aspects of an arm's length transaction. *See generally Forest Oil*, 268 S.W.3d at 60.

Accordingly, we disagree with Frankel's suggestion that a fraudulent-inducement release between fiduciaries is *per se* unenforceable simply because they generally owed each other a duty to disclose. Even if GTP still owed Frankel some duty to disclose, the whole purpose of the fraudulent-inducement release was Frankel's waiver of any claim that GTP violated that duty. Thus, consistent with our reasoning that fiduciaries should be allowed to ensure finality to their disputes, the pertinent inquiry is whether, considering all the circumstances, existence of the fiduciary relationship vitiates a conclusion that Frankel bindingly waived its claim that GTP violated the duty to disclose.

---

interests, he consummated the sale to the third party for significant profit. *Id.* at 419–21, 423–24. In the other partners' suit for breach of fiduciary duty based on the defendant's failure to disclose, the court of appeals rejected his argument that a release in the settlement agreement barred the claim. *Id.* at 430–31. Frankel apparently argues *Harris* establishes that the existence of a fiduciary relationship is an outcome-determinative factor when considering the effect of a release of fraudulent-inducement claims. We disagree. Although the *Harris* court stressed that the presence of a fiduciary relationship distinguished its case from *Schlumberger*, and stated the *Schlumberger* court emphasized the lack of a fiduciary relationship during its analysis, the *Harris* court did not conclude that fiduciaries may *never* disclaim reliance on a fiduciary's representations or duty to disclose information. *Id.* at 431. Instead, the court also focused on the fact the partnership settlement did not include specific disclaimer-of-reliance language and that the other partners were unaware the defendant had negotiated with the third party. *Id.* In fact, the *Harris* court noted *Schlumberger* stands for the proposition that the effect of a disclaimer of reliance should be determined "under the particular facts presented." *Id.* Additionally, *Harris* was decided pre-*Forest Oil*, in which the court expressed that whether the parties dealt at arm's length is a *factor* relative to enforcement of a disclaimer or fraudulent-inducement release. *See Forest Oil*, 268 S.W.3d at 60.

Even if execution of the Settlement Agreement cannot be considered entirely an arm's length transaction because the parties were still fiduciaries, the *Forest Oil* factors support enforceability of the fraudulent-inducement release. As we have discussed, the fraudulent-inducement release is clear and unequivocal, Frankel was represented by its own counsel, Frankel was sophisticated about business matters, the Settlement Agreement was freely negotiated, and the parties specifically discussed the issue which has become the topic of the present dispute. These facts negate any notion that Frankel was somehow dependent on GTP as its fiduciary to explain the fraudulent-inducement release or that Frankel's ability to understand the release was inhibited due to the fiduciary relationship. Likewise, these facts demonstrate that, irrespective of any fiduciary relationship, Frankel voluntarily assented to the fraudulent-inducement release.

Relative to these factors, we also consider it significant that, although Frankel was unaware during settlement negotiations of GTP's extra-contractual fraud, the parties obviously discussed the subject about which GTP concealed information—FGP prospects—because the Settlement Agreement recited the parties' dispute over whether Frankel had an interest in certain prospects, Frankel relinquished an interest in certain prospects, and the parties terminated their relationship as FGP. Considering this fact, together with Frankel's business acumen and representation by counsel, Frankel was afforded the opportunity to question for itself GTP's motives in wishing to terminate FGP and own prospects free and clear of Frankel and whether GTP was concealing information regarding its plans for the prospects; yet, Frankel chose to execute the fraudulent-inducement release. *See id.* at 58 (recognizing, "when knowledgeable parties expressly discuss material issues during contract negotiations but nevertheless elect to include

38

waiver-of-reliance and release-of-claims provisions, the Court will generally uphold the contract").

Moreover, although not expressly listed as a factor in *Forest Oil*, the fact the parties were adverse litigants when they executed the Settlement Agreement also supports enforcement of the fraudulent-inducement release. This posture, again considered together with Frankel's business acumen and representation by counsel, indicates Frankel understood that GTP was protecting its own interests by negotiating inclusion of a fraudulent-inducement release, Frankel could not reasonably rely on GTP to protect Frankel's interests relative to this provision, and Frankel needed to evaluate for itself whether the provision was in its best interest.[15]

Further, the fact the Settlement Agreement contains mutual fraudulent-inducement releases supports a conclusion that each party knew the other party was protecting its own interests. Obviously, when the Settlement Agreement was executed, Frankel did not believe that existence of any fiduciary relationship

---

[15] GTP heavily relies on the fact the parties were adverse litigants when they executed the Settlement Agreement, arguing, as mentioned above, that by virtue of this posture, they owed each other no fiduciary duties. We generally acknowledge that, by the very nature of litigation, adverse litigants cannot be saddled with all duties which might ordinarily accompany a fiduciary relationship because it is axiomatic that a litigant cannot place the other litigant's interests above its own in all respects. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992) (recognizing the onerous burden that requires a party to place the interest of the other party before his own is often attributed to a fiduciary duty). Nonetheless, we need not parse out what, if any, duties may still exist even when fiduciaries have become adverse parties in litigation. We do not foreclose the possibility that, under certain circumstances, existence of a fiduciary relationship might vitiate a fraudulent-inducement release even if the parties have become adverse litigants. We merely conclude that, under the circumstances of the present case, the fact the parties were adverse litigants supports enforceability of the fraudulent-inducement release.

vitiated a fraudulent-inducement release because it also accepted the benefit of such a provision.

The additional factor mentioned in *Forest Oil* also is satisfied in the present case: the Settlement Agreement terminated the parties' relationship. This consideration, combined with the fact the parties executed mutual fraudulent-inducement releases, shows that, via these provisions, they deliberately intended to ensure finality to their relationship and prevent further disputes.

In summary, considering all of the *Forest Oil* factors, we conclude that that evidence negates any notion that GTP, by virtue of the fiduciary relationship, foisted a fraudulent-inducement release on an unwitting Frankel. Instead, the factors demonstrate that, despite any fiduciary relationship, sophisticated parties, represented by their own counsel, negotiated and voluntarily agreed to clear and unequivocal, mutual provisions releasing any claims for fraudulent-inducement of their Settlement Agreement.

Finally, we reject the trial court's reasoning that the parties were required to contractually disavow any fiduciary duties in order to execute an enforceable fraudulent-inducement release. In particular, we reject the proposition that Frankel needed to engage in such formal exercise to know GTP was protecting its own interests by requesting a release of fraudulent-inducement claims, understand the effect of the provision, and realize Frankel was not forced to accept the provision. We also agree with GTP that prescribing such a requirement could create additional difficulties which might defeat the finality sought to be achieved via enforcement of a fraudulent-inducement release; for example, the releasing party might claim it was fraudulently induced to disavow fiduciary duties, thus perpetuating the cycle of disputes. Again, a court should focus instead on

determining whether the fraudulent-inducement release is enforceable, despite existence of a fiduciary relationship, based on all the circumstances.

Accordingly, the trial court erred by rescinding the Settlement Agreement because the fraudulent-inducement release was enforceable. We sustain GTP's first issue.

## C.     Application of Our Holding to GTP's Requested Relief

### 1.     Order of rescission

In light of our disposition of GTP's first issue, we will reverse the trial court's order of rescission, with the concomitant rulings that the parties return benefits already received pursuant to the Settlement Agreement.

### 2.     Equitable-disgorgement award

Because the Settlement Agreement is not rescinded, the entire release provision is effective and bars Frankel's breach-of-fiduciary-duties claim on which the equitable-disgorgement award was based. We note Frankel does not argue that the release, if enforceable, is inapplicable to its claim for breach of fiduciary duties. Indeed, Frankel apparently sought rescission to pave the way for recovery on its various claims.

Nevertheless, we note that the breach-of-fiduciary-duties claim is encompassed within categories (ii) and (iii) of released claims. With respect to category (ii), Frankel's claims that GTP concealed it had formed Trifecta and was negotiating a sale of FGP prospects to Probe and used FGP's confidential information to market prospects for GTP's own benefit (to the exclusion and detriment of Frankel) were "unknown" "claims which . . . relate in any way" to the

41

"claims made by [Frankel] in the Bankruptcy Proceeding"; i.e., Frankel's claim in the Bankruptcy Proceeding that it was not in default and indeed had an interest in some of these prospects and GTP breached the Participation Agreement by failing to use its best efforts to market prospects on behalf of FGP. Category (iii) is even broader; Frankel's grounds for alleging GTP breached fiduciary duties were "unknown" "claims which . . . could have been brought in . . . any other litigation." Accordingly, the trial court erred by awarding equitable disgorgement.[16]

### 3. GTP's claim for breach of the Settlement Agreement

GTP also seeks to recover $18,000, plus $1,300,000 in attorney's fees, based on the jury's finding that Frankel breached the Settlement Agreement. We conclude GTP has not demonstrated it is entitled to such recovery.

In response to six separate questions, the jury made the following findings relative to the parties' breaches of the Settlement Agreement:

| | |
|---|---|
| Question 8: | Each GTP entity committed a material breach. |
| Question 9: | GTP's material breach was excused by Frankel's prior material breach. |
| Question 10: | Frankel committed a material breach. |
| Question 11: | Frankel's material breach was excused by one or more of the following actions by GTP: (1) prior material breach; (2) general fraud; (3) breach of fiduciary duties; or (4) fraudulent inducement of the Settlement Agreement. These grounds were submitted in one question generally asking if Frankel's breach was excused, rather than itemized as separate inquiries, and the jury was not |

---

[16] In light of this conclusion, we need not address GTP's second and third issues.

instructed to specify which of the particular alternative ground(s) supported the finding.

Question 12:      GTP committed the first breach.

Question 13:      $18,000 would fairly and reasonably compensate GTP for damages resulting from Frankel's material breach—defined as the amount of "rental refunds and delay rentals" GTP was entitled to, but did not, receive under the Settlement Agreement.

As GTP acknowledges, the jury found both parties materially breached, both parties were excused, and GTP breached first.  GTP apparently characterizes the following as reflecting the jury's findings:

- GTP *immaterially* breached first because its cash payment required under the Settlement Agreement was late (per Question 12, which did not include the term "material")

- Frankel then *materially* breached by failing to pay GTP "rental refunds and delay rentals" as required under the Settlement Agreement (per Questions 10 and 13, which addressed Frankel's "material" breach)

- GTP then *materially* breached (per Question 8)—a different action than its earlier *immaterial* breach (hence, the separate Question 12)

- Frankel's breach was the first *material* breach (per Question 9, finding GTP's material breach was excused by Frankel's *prior* material breach, considered together with Question 11, finding Frankel's material breach was excused but not limiting the grounds for excuse to any prior material breach by GTP)

Therefore, GTP contends that it is entitled to recover $18,000 in damages because Frankel committed the first *material* breach which was not excused by any prior material breach of GTP.  GTP cites *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195 (Tex. 2004), for the proposition that the relevant inquiry is "which party *materially* breached first."

43

Presuming, without deciding, that GTP's characterization accurately reflects the jury's determination, we disagree that GTP has shown it is entitled to recover damages simply because Frankel committed the first material breach.[17]   Under GTP's interpretation of the jury's findings, the jury did not find in response to Question 11 that Frankel's material breach was excused by a prior material breach of GTP.   However, prior material breach was not the only possible ground for the jury to find Frankel's material breach was excused.

For instance, the jury was instructed that general "fraud" was a ground for excusing Frankel's material breach.  We note that it is not clear what "fraud" this instruction references because it was submitted as a separate ground than fraudulent inducement of the Settlement Agreement and Frankel did not expressly plead any separate basis for fraud.  Nevertheless, GTP does not argue that general fraud was improperly submitted to the jury, the evidence is insufficient to support any such finding, or this general fraud was not a ground for excusing Frankel's material breach.  GTP does not advance any argument relative to how a finding of general fraud should be considered in context of all the jury findings regarding breaches of the Settlement Agreement or GTP's proposed timeline regarding the breaches.  Under these circumstances, no proper basis has been established for disregarding the jury's finding in answer to Question 11 that Frankel's material breach of the Settlement Agreement was excused.  In light of this finding, GTP may not recover on its claim for breach of the Settlement Agreement.

---

[17] Frankel argues that reconciling the jury's findings demonstrates GTP committed the first material breach.  We need not decide which party's construction is accurate because we conclude GTP has failed to show it is entitled to recover damages even under its interpretation of the jury's answers.

Accordingly, although the Settlement Agreement is valid, we uphold the trial court's take-nothing judgment on GTP's claim for breach of this contract, albeit for a different reason than described by the trial court.

### III. CONCLUSION

We reverse the portion of Paragraph D.1. of the judgment in which the trial court ordered rescission of the Settlement Agreement.

We reverse the portion of Paragraph D.4. of the judgment in which the trial court ordered that Frankel recover $1,359,643.55 from Grimes, $1,970,959.73 from PetroVal, and $679,571.78 from Texas Standard, as equitable disgorgement for their breaches of fiduciary duties.

We reverse in its entirety Paragraph D.6. of the judgment, in which the trial court (a) ordered rescission of the Settlement Agreement, ordered the parties to return payments and interests already received under the Settlement Agreement, and pronounced Frankel is relieved of any further obligations under the Settlement Agreement, (b) ordered that Frankel recover $1,359,643.55 from Grimes, $1,970,959.73 from PetroVal, and $679,571.78 from Texas Standard for their breaches of fiduciary duties, and (c) awarded post-judgment interest on this recovery.[18]

We render judgment denying Frankel's request for rescission of the Settlement Agreement and ordering that Frankel take nothing on its request for equitable disgorgement.

---

[18] Most of paragraphs D.1. and D.4. contain the trial court's reasoning for the relief granted. However, the trial court actually orders rescission and awards equitable disgorgement at the end of these respective paragraphs. Paragraph D.6. is a "CONCLUSION," rendering judgment for Frankel for rescission, equitable disgorgement, and post-judgment interest. Accordingly, we reverse all portions of the judgment in which the trial court orders this actual relief.

45

We affirm the remainder of the judgment.

/s/    Charles W. Seymore
Justice

Panel consists of Justices Frost, Seymore, and Boyce (Frost, J., concurring).