**Affirmed and Memorandum Opinion filed March 16, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-19-00387-CV

---

**AUSTIN TRUST COMPANY AS TRUSTEE OF THE BOB AND ELIZABETH LANIER DECENDANTS TRUSTS FOR ROBERT CLAYTON LANIER, JR., FOR MARY ELIZABETH LANIER, FOR SCOTT AUGUSTUS LANIER, FOR SUSAN HOLLY LANIER, FOR JOHN FREDERICK LANIER, ROBERT CLAYTON LANIER, JR., MARY ELIZABETH LANIER, SCOTT AUGUSTUS LANIER, SUSAN HOLLY LANIER, AND JOHN FREDERICK LANIER, AND ROBERT CLAYTON LANIER, JR., INDIVIDUALLY, MARY ELIZABETH LANIER, INDIVIDUALLY, SCOTT AUGUSTUS LANIER, INDIVIDUALLY, SUSAN HOLLY LANIER, INDIVIDUALLY, AND JOHN FREDERICK LANIER, INDIVIDUALLY, Appellants**

V.

**JAY HOUREN, AS INDEPENDENT EXECUTOR OF THE ESTATE OF ROBERT C. LANIER, DECEASED, Appellee**

---

**On Appeal from the Probate Court No. 4
Harris County, Texas
Trial Court Cause No. 436193-401**

---

## MEMORANDUM OPINION

Appellants Austin Trust Company as Trustee of the Bob and Elizabeth Lanier Descendants Trust for Robert Clayton Lanier, Jr., for the Bob and Elizabeth Lanier Descendants Trust for Mary Elizabeth Lanier, for the Bob and Elizabeth Lanier Descendants Trust for Scott Augustus Lanier, for the Bob and Elizabeth Lanier Descendants Trust for Susan Holly Lanier, for the Bob and Elizabeth Lanier Descendants Trust for John Frederick Lanier, and Robert Clayton Lanier, Jr., Individually, Mary Elizabeth Lanier, Individually, Scott Augustus Lanier, Individually, Susan Holly Lanier, Individually, and John Frederick Lanier, Individually, appeal (1) the trial court's partial summary judgment declaring, among other things, that appellee Jay Houren, independent executor of the estate of Robert C. Lanier, deceased, did not owe appellants an alleged $37,405,964 debt, and (2) the trial court's award of attorneys' fees assessed after a bench trial. Finding no error, we affirm.

## BACKGROUND

Mayor Robert Lanier (the "Mayor") was the surviving spouse of Elizabeth G. Lanier, who died in 1984. Elizabeth was also survived by her five children with the Mayor, Susan Holly Lanier, Robert Clayton Lanier, Jr., Mary Elizabeth Lanier,[1] Scott Augustus Lanier, and John Frederick Lanier (collectively "Elizabeth's Children"). After Elizabeth's death, the Mayor married Elyse Lanier, to whom he remained married until his own death.

Elizabeth's will created the Robert C. Lanier Marital Trust ("Marital Trust") upon her death. The Mayor was the sole trustee and beneficiary of the Marital Trust until his death. At the time of her death, Elizabeth's half of the community

---

[1] Mary Elizabeth Lanier has died. A Suggestion of Death was filed in the trial court on January 16, 2019.

2

estate was valued at approximately $54 million. Elizabeth placed the majority of the $54 million in assets in the Marital Trust.

The Marital Trust required mandatory distributions of Marital Trust income. As a result, the Mayor received mandatory distributions of Martial Trust income from its creation until his death in 2014.[2] In addition, the Mayor, as trustee, was permitted to pay himself "such amounts of the principal of the trust as Trustee in its sole judgment may determine are necessary for his health, support, or maintenance in his accustomed standard of living." The Marital Trust further provided that "in determining whether principal is necessary for that purpose, Trustee shall consider resources reasonably available to him for that purpose; but if principal is to be paid to my husband, payment from this trust shall be preferred over payment from the trust under Article V hereof or similar trusts."[3] Over the Mayor's lifetime, his distributions to himself from the Marital Trust totaled

---

[2] Because the Marital Trust provided for mandatory income distributions and was for the sole lifetime benefit of the Mayor, he elected to treat the Marital Trust as a "qualified terminal interest property" trust, often referred to as a QTIP trust. *See* 26 U.S.C. § 2056(b)(7); *Estate of Hearn v. Hearn*, 101 S.W.3d 657, 661 n.4 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("This is commonly referred to as a QTIP trust. By qualifying the trust property for the marital deduction, the testator is assured that the property is not taxed both when it passes to the trust and again upon the surviving spouse's death and the termination of her life estate in the corpus of the trust."). As a result of this designation as a QTIP trust, the assets passing to the Marital Trust from Elizabeth's estate would not be subject to the federal estate tax in 1984, when the highest marginal estate tax rate was 55 percent. *See* U.S.C. § 2056(a). The Marital Trust's assets would be subject to federal estate taxes upon the Mayor's death. *See* 26 U.S.C. § 2044(a). Failure to make the mandatory income distributions could jeopardize the Marital Trust's QTIP status, which allowed it to avoid payment of the federal estate taxes.

[3] Article V of Elizabeth Lanier's will created the Lanier Family Trust. Elizabeth Lanier designated the Mayor as trustee of this trust. The Lanier Family Trust provided that the Mayor, as trustee, "may pay, to any one or more of a group consisting of my husband and my issue then living, such amounts of the net income and principal of the Trust as Trustee may determine are necessary for each such person's health, support, maintenance, or education in the standard of living to which that person has been accustomed. In determining whether income or principal is necessary for that purpose as to each person, Trustee shall consider all resources reasonably available to that person for that purpose."

3

$37,405,964. When the Mayor died thirty years later, the value of the Marital Trust was approximately $5.5 million.

Elizabeth's will granted the Mayor a testamentary power of appointment over the remaining principal of the Marital Trust in favor of Elizabeth's Children, their spouses, or unspecified charities. In his will, the Mayor exercised the testamentary power of appointment and directed that the Marital Trust assets remaining at his death pass to the "Bob and Elizabeth Lanier Descendants Trusts" (the "Descendants Trusts") for the benefit of each of Elizabeth's Children.

The Mayor left other assets from his own Estate to his second wife, Elyse, and her two children. This reflected an overall estate plan of distributing the Marital Trust's assets to Elizabeth's Children and the Mayor's Estate to Elyse.

Subject to the administration of the Mayor's Estate and the transfer of the Marital Trust's assets, the Marital Trust terminated upon the Mayor's death. Cadence Bank succeeded the Mayor as the trustee of the Marital Trust "for the purposes of administering the Marital Trust during a winding-up period and making final terminating distributions of the Marital Trust's assets[.]"

Jay Houren, the Mayor's personal attorney, served as the independent executor of the Mayor's Estate. As the independent executor of the Mayor's Estate, Houren never had possession of, or control over, the Marital Trust's assets because they never became part of the Mayor's Estate. Instead, subject to the winding-up period, they passed immediately to the Descendants Trusts. Because the Marital Trust was a QTIP trust, the Mayor's Estate was entitled to recover from the Marital Trust and the Descendants Trusts any federal estate taxes owed by the Mayor's Estate. *See* 26 U.S.C. § 2207A. Because of this estate tax recovery right, the trustee of a QTIP trust usually will not make any significant distributions until a federal estate tax return has been filed and an estate tax closing letter has been

4

received from the Internal Revenue Service.

Anticipating this delay, Elizabeth's Children "expressed a desire for the Marital Trust to distribute its assets to the Descendants Trusts" before Houren filed the federal tax return for the Mayor's Estate and received the estate tax "closing letter" from the IRS. In order to accommodate Elizbeth's Children's desire for expedited distributions from both the Mayor's Estate and the Marital Trust without fear of future claims, Houren set up a meeting with all interested parties where he proposed a "Family Settlement Agreement." Houren hoped an agreement of this type would resolve all potential issues that could interfere with the early distribution goal. The participants in the meeting included Houren, individually and as executor of the Mayor's Estate, Elizabeth's Children, Elyse Lanier and her descendants, and Cadence Bank as the trustee of the Marital Trust and the Descendants Trusts. At the meeting, Elizabeth's Children as well as Cadence Bank were represented by their own attorneys.

During the ensuing negotiations, the parties, through their attorneys, received Disclosures, including accounting ledgers for the Mayor, the Marital Trust, and certain related entities listing transactions from 2009 through 2014. The Disclosures include the document Austin Trust[4], relies upon in the present litigation, to claim that the Mayor either (1) owed the Marital Trust a $37 million debt, or (2) breached an alleged fiduciary duty by taking excessive distributions of principal totaling more than $37 million.[5] Eventually, all parties executed the FSA.

---

[4] Austin Trust succeeded Cadence Bank as trustee of the Descendants Trusts.

[5] The document is an excerpt from the General Ledger of the "R.C. Lanier Marital Trust." It reflects that as of December 31, 2014 there was an "A/R – Robert C. Lanier" totaling $37,405,964.03. The trial court sustained Houren's hearsay objection to appellants' use of the ledger excerpt, as well as appellants' expert's testimony based on that excerpt.

The parties acknowledged in the FSA that they were represented by counsel of their choice, or they consciously chose not to be represented by an attorney, and also that they, and their attorneys, "had a reasonable opportunity to read and understand the entirety of this Agreement, including the Disclosures, and have had a reasonable opportunity to consult with and ask questions of his, her, or its attorney regarding the [FSA] and the Disclosures prior to execution of the [FSA]." Appellants further acknowledged that they "had access to or been given the opportunity to review relevant records or other materials as [they] may have requested before executing" the FSA.

In the FSA, the parties recited that they had "reached certain agreements regarding claims each Party may or may not have regarding other parties, the Estate, the Companies, and the Trusts, including, but not limited to, claims related to the facts as set forth in Article I of this Agreement and claims that may or may not be evidenced by the Disclosures." The parties also approved of the FSA, "including the releases and indemnities" included within its terms and they agreed to "fully comply with the terms of [the FSA], including the releases and indemnities provided herein."

In the FSA, the parties agreed:

> . . .that this Agreement represents a reasonable settlement of any and all Claims that may exist, now or in the future. As such, the other Parties to which the Executor may owe any type of duty acknowledge (i) that the Executor has not conducted a significant accounting or investigation of the facts contained in Article I . . . or the Disclosures, (ii) that they have not requested that the Executor conduct any such accounting or investigation, and (iii) that they have asked the Executor to execute this Agreement without incurring the cost or delay likely involved with such accountings or investigations in order to ensure an orderly and expeditious settlement of the Estate.

In addition, the FSA includes the following: "notwithstanding the payment

6

by the Marital Trust and the 2003 Grantor Trust of the Appraisals, all Parties agree that the Executor and the law firm of Crady, Jewett & McCully, LLP do not in any way represent the Marital Trust, the 2003 Grantor Trust, their trustees, or their beneficiaries." Finally, the Parties agreed "that the Executor and his successors have the obligation to pay all debts and claims of the [Mayor's] Estate, including Estate and Gift Taxes, as well as all Other Taxes (as defined herein). All parties agree, acknowledge, and affirm that they may be liable, under Transferee Liability, for debts of or claims against the [Mayor's] Estate, including for unpaid taxes, even after the assets of the [Mayor's] Estate have been fully distributed."

The release and indemnity agreements in the FSA are materially the same for all of the parties. The release generally applies to "any and all liability arising from any and all Claims," as defined in the FSA, against the other parties or relating to "Covered Activities," as defined in the FSA. The released claims included, but were not limited to "claims of any form of sole, contributory, concurrent, gross, or other negligence, undue influence, duress, breach of fiduciary duty, or other misconduct by the other parties, the professionals, or their affiliates[.]" The FSA defined "Covered Activities" as (1) "the formation, operation, management, or administration of the Estate, . . . or the Trusts," (2) "the distribution (including, but not limited to, gifts or loans) (or failure to distribute) of any property or asset of or by the Mayor, the Estate, . . . or the Trusts," (3) "any actions taken (or not taken) in reliance upon this Agreement or the facts listed in Article I," (4) "any Claims related to, based upon, or made evident in the Disclosures," and (5) "any Claims related to, based upon, or made evident in the facts set forth in Article I" of the FSA.

The last signatures on the FSA were obtained on June 10, 2015. The trustee of the Marital Trust began unwinding the Marital Trust and distributing funds to

the Descendants Trusts at that time. In addition, Houren filed the federal estate tax return for the Mayor's Estate in early 2016. The return did not list the alleged debt as either an asset of the Marital Trust or a liability of the Mayor's Estate. Houren sent copies of the return to Cadence Bank. Once Houren received an estate tax "closing letter" from the IRS in June 2016, he distributed all of the Mayor's Estate's assets as directed by the Mayor's will, save for a small reserve to cover planned administration expenses in winding down the Estate.

Eventually, Austin Trust sent a demand letter to Houren seeking repayment of an alleged debt owed by the Mayor's Estate. Austin Trust based its demand on the accounting entries in the General Ledger of the Marital Trust. According to Austin Trust, the records "reflect a $37,405,964 debt . . . that the Mayor owed to the Marital Trust at his death." Austin Trust, recognizing that the Mayor's Estate no longer possessed any assets, asserted that the debt should be paid from "the community property interests of the Mayor in the assets reflected on Schedule M [of the Estate's federal estate tax return], as well as the community property interest of his surviving spouse[.]" The demand letter enclosed a single two-paged exhibit. One page was a printout from the Mayor's 2014 general ledger showing "A/DIST" of $37,405,964.03. The other was a printout from the Marital Trust's 2014 general ledger showing "A/R" of $37,405,964.03.

Houren investigated Austin Trust's claim. Houren averred in an affidavit that Cecil Holley, the accountant for the Marital Trust and the Mayor personally, "confirmed, unequivocally, that the entries were merely an artifact of the accounting software and represented distributions from the Marital Trust, not receivables." Based on his investigation, Houren rejected the claim. Houren then filed a declaratory judgment action against Austin Trust as trustee of the Descendants' Trusts and Elizabeth's Children, initially seeking a declaration that

8

the alleged $37 million debt did not exist. Austin Trust and the Children answered, and Austin Trust filed a counterclaim for a contrary declaration. Austin Trust subsequently amended its counterclaim to add an alternative claim for breach of fiduciary duty against the Mayor's Estate. Austin Trust based this claim on allegations that the Mayor violated the terms of the Marital Trust by taking excessive distributions from the Marital Trust.

Houren eventually filed a motion for partial summary judgment on both sides' claims for declaratory relief as well as on Austin Trust's breach of fiduciary duty counterclaim. Houren argued that he had proved as a matter of law that the alleged debt did not exist and also that Austin Trust had released all claims to recover an alleged debt as well as any claim for breach of fiduciary duty when it agreed to the FSA. The trial court agreed and it granted the motion. The only remaining issue to be resolved after the partial summary judgment was Houren's request for attorneys' fees on behalf of the Mayor's Estate. The trial court conducted a bench trial to determine the amount of attorneys' fees owed to the Mayor's Estate under the terms of the FSA. The trial court then signed an order awarding attorney fees to the Mayor's Estate's. The trial court subsequently signed findings of fact and conclusions of law for the attorneys' fees trial. This appeal followed.

## ANALYSIS

Appellants raise five issues on appeal. The first four assert that the trial court erred when it granted Houren's motion for partial summary judgment. We address these issues together. Because we ultimately affirm the trial court's partial summary judgment, we need not address appellants' fifth issue challenging the trial court's award of attorneys' fees to Houren because it is contingent on a reversal of the trial court's partial summary judgment.

9

## I. Standard of review and applicable law

We review declaratory judgments under the same standard as other judgments or decrees. Tex. Civ. Prac. & Rem. Code § 37.010; *Hawkins v. El Paso First Health Plans, Inc.*, 214 S.W.3d 709, 719 (Tex. App.—Austin 2007, pet. denied). Here, because the trial court rendered the declaratory judgment through summary judgment proceedings, "we review the propriety of the trial court's declarations under the same standards we apply to summary judgment." *Hawkins*, 214 S.W.3d at 719. To prevail on a traditional motion for summary judgment, the movant must establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). We review a trial court's order granting a traditional summary judgment de novo. *Mid–Century Ins. Co. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007). When a plaintiff moves for summary judgment on his cause of action, he must conclusively prove all essential elements of the claim as a matter of law. *Cullins v. Foster*, 171 S.W.3d 521, 530 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). When a defendant moves for summary judgment, it must disprove at least one essential element of the plaintiff's cause of action in order to prevail. *Doggett v. Robinson*, 345 S.W.3d 94, 98 (Tex. App.—Houston [14th Dist.] 2011, no pet.). In addition, when the movant is a defendant, a trial court should grant summary judgment if the defendant conclusively establishes each element of an affirmative defense. *Clark v. ConocoPhillips Co.*, 465 S.W.3d 720, 724 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The nonmovant has no burden to respond to a motion for summary judgment unless the movant conclusively establishes each element of its cause of action as a matter of law. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999). If the movant establishes entitlement to judgment, then the burden shifts to the nonmovant to come forward with competent controverting evidence

10

sufficient to raise a genuine issue of material fact. *Muller v. Stewart Title Guar. Co.*, 525 S.W.3d 859, 868 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

A release is a contract and therefore is subject to the same rules of construction. *Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.*, 468 S.W.3d 200, 205 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990)). In addition, a release is an affirmative defense. *Barras v. Barras*, 396 S.W.3d 154, 170 n.5 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). In construing a written contract, an appellate court's primary goal is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). When construing a contract, we give contract terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and we avoid, when possible and proper, a construction that is unreasonable, inequitable, or oppressive. *Frost Nat'l Bank v. L & F Distrib., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). Courts are not authorized to rewrite agreements to insert provisions parties could have included or to imply terms for which they have not bargained. *Tenneco, Inc. v. Enterprise Prod. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). In other words, courts cannot make, or remake, contracts for the parties. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998).

Whether a contract is ambiguous is a question of law for the court to decide by examining the agreement as a whole in light of the circumstances present when the contract was entered. *Lane-Valente Indus. (Nat'l), Inc.*, 468 S.W.3d at 205. A contract is unambiguous if it can be given one certain or definite legal

11

interpretation. *Id.* The fact that the parties disagree about a contract's meaning does not necessarily show that it is ambiguous. *Id.* In addition, parol evidence is not admissible for the purpose of creating an ambiguity. *Material Partnerships, Inc. v. Ventura*, 102 S.W.3d 252, 258 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). If a contract is not ambiguous, the court will construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

**II.  Appellants released their claims against Houren and the Mayor's Estate when they signed the FSA.**

Appellants argue that the trial court erred when it granted Houren's motion for summary judgment and declared that they had "released their right to collect any debt from the Executor or the Estate that existed prior to June 10, 2015 by executing the June 10, 2015 Family Settlement Agreement." They also assert that the trial court erred when it declared that the "Descendants Trusts further released all the claims they brought in their First Amended Counterclaim in the Family Settlement Agreement" which includes their breach of fiduciary duty claims. Houren responds that the trial court did not err because the FSA unambiguously and specifically released all claims appellants may have had against the other parties to the FSA, including breach of fiduciary duty. We agree.

None of the parties to this appeal argue that the FSA is ambiguous, and we agree that it is not. We therefore construe it as a matter of law. *See id.*

Texas public policy favors broad freedom to contract as the parties see fit. *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 553 (Tex. 2001). Here appellants sought a rapid distribution of the assets held by the Mayor's Estate and the Marital Trust. Houren, as the executor of the Mayor's Estate, while not opposed to a rapid distribution of assets, was concerned about protecting the Mayor's Estate from future claims that might arise after a distribution of the Estate's assets occurred.

12

The parties entered into negotiations to achieve their respective goals. Each party was represented by experienced counsel or deliberately chose not to be represented. The FSA was the result.

In the FSA, the parties agreed that the releases contained therein generally applied to "any and all liability arising from any and all Claims," as defined in the FSA, against the other parties or relating to "Covered Activities," as defined in the FSA. The released claims included, but were not limited to "claims of any form of sole, contributory, concurrent, gross, or other negligence, undue influence, duress, breach of fiduciary duty, or other misconduct by the other parties, the professionals, or their affiliates[.]" The FSA defined "Covered Activities" as (1) "the formation, operation, management, or administration of the Estate, . . . or the Trusts," (2) "the distribution (including, but not limited to, gifts or loans) (or failure to distribute) of any property or asset of or by the Mayor, the Estate, . . . or the Trusts," (3) "any actions taken (or not taken) in reliance upon this Agreement or the facts listed in Article I," (4) "any Claims related to, based upon, or made evident in the Disclosures," and (5) "any Claims related to, based upon, or made evident in the facts set forth in Article I" of the FSA. We conclude that this language specifically and unambiguously released appellants' claims asserted in their First Amended Counterclaim. *See Province Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. 1942) ("Parties make their own contracts and it is not within the province of this court to vary their terms in order to protect them from their oversights and failures . . . ." (internal quotation marks omitted)); *Bennett v. Commission for Lawyer, Discipline*, 489 S.W.3d 58, 70 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("We are not authorized to rewrite the parties' contract under the guise of interpreting it, even if one of the parties has come to dislike one of its provisions.").

The fact that the Mayor and Houren may have owed the other parties a fiduciary duty, a question we need not reach, does not change this analysis. In reaching this conclusion, we find the case of *Harrison v. Harrison Interests, Ltd.* instructive. 14-15-00348-CV, 2017 WL 830504, at *4 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, pet. denied) (mem. op.). In *Harrison*, the beneficiary of three trusts entered into a release and settlement agreement with the beneficiary's uncle and a manager of the family business in which the beneficiary was involved. *Id*. at *1. The uncle and business manager were co-trustees of the trusts and independent co-executors of the estate of the beneficiary's father. *Id*.

A dispute arose between the beneficiary and the trustees regarding the beneficiary's role in the family business, and the parties began to negotiate a settlement agreement allowing for an early distribution of trust assets to the beneficiary. *Id*. All the parties were represented by counsel; the beneficiary's counsel included trusts and estates specialists. *Id*. at *1-2. The parties eventually entered into a settlement agreement, which listed numerous concerns and provided for the expedited distribution of trust assets to the beneficiary. *Id*. The beneficiary also released and indemnified the trustees for actions prior to the execution of the settlement agreement. *Id*. After the execution of the settlement agreement and the first set of releases, the beneficiary received a distribution without challenging the releases. *Id*. at *5. But before the final distribution the beneficiary refused to execute a final release covering the period of time after the execution of the settlement agreement. *Id*. at *1. The beneficiary sued the trustees, who counterclaimed. Competing motions for summary judgment were filed. *Id*. The trial court granted summary judgment in favor of the trustees. *Id*.

In upholding the trial court's implied determination that the release was valid, our court noted that the record reflected that the settlement agreement "was

not executed solely for the purpose of prematurely distributing assets to [the beneficiary] but also to terminate his relationship with [the trustees] and settle all claims against them. This severance of the relationship is achieved not only through purchasing each other's interest in commonly-held assets, but by releasing [the trustees] from their fiduciary duties." *Id.* at *5. This court held that six factors were key to their decision to affirm the settlement agreement: (1) the terms of the contract were negotiated rather than boilerplate, and the disputed issue was specifically discussed; (2) the complaining party was represented by legal counsel; (3) the negotiations occurred as part of an arms-length transaction; (4) the parties were knowledgeable in business matters; (5) the release language was clear; and (6) the parties were working to achieve a once and for all settlement of all claims so they could permanently part ways. *Id.* (citing *Texas Standard Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.*, 394 S.W.3d 753, 763 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). An examination of the record reveals that all of these factors are present here with respect to appellants, the complaining parties.

We therefore conclude that even if the Mayor and Houren owed appellants fiduciary duties, appellants released any claims for breach of those duties when they executed the FSA. *Id.* This decision adheres to the public policy in favor of Texas courts upholding contracts negotiated at arms-length by knowledgeable and sophisticated business players represented by highly competent and able legal counsel. *Id.* We overrule appellants first three issues.

Having overruled appellants' first three issues, we need not address their fourth issue asserting that the trial court abused its discretion when it sustained Houren's hearsay objections to the general ledgers of the Marital Trust and the Mayor and the testimony of appellants' expert based on those ledgers. We also need not address appellants' argument challenging Houren's right to

15

indemnification under the terms of the FSA because this argument was conditioned on a reversal of the trial court's partial summary judgment order. Finally, we need not address appellants' fifth issue challenging the trial court's award of attorneys' fees to Houren because it was also conditioned on a reversal of the trial court's summary judgment granting declaratory relief to Houren.

## CONCLUSION

Having overruled all of appellants' issues necessary to resolve this appeal, we affirm the trial court's final judgment.

/s/    Jerry Zimmerer
        Justice

Panel consists of Justices Zimmerer, Poissant, and Wilson.

16